804 So.2d 532 (2002)
Rodney CRAIG, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D99-1629.
District Court of Appeal of Florida, Third District.
January 9, 2002.
*533 Bennett H. Brummer, Public Defender, and Roy A. Heimlich, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General, and Margaret A. Brenan, Assistant Attorney General, for appellee.
Before JORGENSON, COPE and RAMIREZ, JJ.
COPE, J.
Rodney Craig appeals an order committing him for involuntary mental health treatment under the Baker Act, §§ 394.451, 394.467, Florida Statutes (1999). We affirm.

I.
Appellant was arrested for stalking Julia Yarbough, a local television news reporter. After appellant's arrest, the State commenced a proceeding to have appellant involuntarily placed for treatment under the Baker Act. The petition was referred to a general master who conducted evidentiary hearings. He recommended commitment for treatment. Appellant's exceptions to the master's report were rejected by the circuit court, and this appeal was filed.
While the appeal was pending, appellant completed treatment and was released from hospitalization. He entered into a plea bargain for a term of one year's probation on the stalking charge, to be served in appellant's home state of California.
The first issue is whether the appeal is moot. The commitment here was only five weeks long and it was impossible to obtain plenary appellate review during that time period. Because this matter is capable of repetition, yet evading review, the case is not moot. Roesch v. State, 633 So.2d 1, 2 n. 1 (Fla.1993); see also Pullen v. State, 802 So.2d 1113, 1119 (Fla.2001).

II.
Appellant argues that the evidence was legally insufficient to commit him under the Baker Act.
Two important facts are undisputed. (1) Appellant was mentally ill at the times relevant here. (2) Appellant was incompetent to make a decision whether to consent to treatment.[1] Thus, those parts of the involuntary commitment criteria were satisfied. See § 394.467(1)(a)1.b., Fla. Stat. (1999).
In order to obtain an involuntary commitment, the State must also establish that the patient meets one of the statutory standards for showing that the patient poses a potential for harm to himself or others. See id. § 394.467(1)(a)2. The State in this case argued that under the evidence, the appellant qualified for commitment under the following statutory provision:
b. There is substantial likelihood that in the near future he or she will inflict serious bodily harm on himself or herself or another person, as evidenced *534 by recent behavior causing, attempting, or threatening such harm ....
Id. § 394.467(1)(a)2.b.[2]
In this case the general master found that appellant had caused the reporter to be in fear for her safety and that she had suffered emotional injury. Relying on In re Beverly, 342 So.2d 481 (Fla.1977), the master concluded that an emotional injury satisfied this element of the Baker Act. The trial court agreed.
The appellant argues that under the current version of the Baker Act, proof of a purely emotional injury is insufficient. Appellant is correct.
By its terms, the statute requires a finding of a substantial likelihood that the patient "will inflict serious bodily harm on himself or herself or another person ...." § 394.467(1)(a)2.b. (Emphasis added). An emotional injury is not enough.
The master and the trial court relied on In re Beverly. However, that case involved the 1973 version of the Baker Act which provided, in part, that a patient could be committed if "[l]ikely to injure himself or others if allowed to remain at liberty ...." § 394.467(1)(a), Fla. Stat. (1973) (quoted in In re Beverly, 342 So.2d at 483). The 1973 statute was broad enough to include emotional injury as well as physical injury. 342 So.2d at 487.
The Baker Act was subsequently amended. It now specifies "serious bodily harm," § 394.467(1)(a)2.b., Fla. Stat. (1999), rather than "harm."
The master and the trial court erred in concluding that a purely emotional injury satisfies this statutory element.

III.
For the reasons which follow, we conclude that the master and the trial court reached the correct result. The evidence established a substantial likelihood of serious bodily harm, as required by the statute.
The master took the view that under the statute, there had to be a direct threat of bodily harm made by the appellant to the reporter, in specific words. We conclude that the master misapprehended the statute on this point, as well as the legal effect of the evidence.

A.
Under the statutory standard, there must be a showing of a "substantial likelihood that in the near future he or she [the patient] will inflict serious bodily harm on himself or herself or another person, as evidenced by recent behavior causing, attempting, or threatening such harm ...." § 394.467(1)(a)2.b., Fla. Stat. (1999) (emphasis added).
A threat can be express or implied. A threat can be made in words, by conduct, or both.
*535 In determining whether there has been a threat, the court must look at the totality of the circumstances, including not only the words and deeds of the patient, but the diagnoses and expert opinions of the mental health professionals.[3]
The statute does not define "serious bodily harm." Id. It is our view that serious bodily harm would include any harm that would necessitate medical treatment. Because of the potential for death or serious injury in kidnapping cases, a threat of kidnapping or false imprisonment would satisfy the statute.

B.
In the present case, the appellant became infatuated with the reporter when she worked for a Los Angeles television station. When the reporter ceased appearing on the air, the appellant contacted the station and learned that the reporter had taken a job with a Miami television station.
The appellant made trips to Miami, and then moved to Miami, to pursue his objective of being with the reporter. Along the way, he formed the delusion that he and the reporter were already married, and that they had a child together.
The reporter does not know the appellant and has no relationship with him. Needless to say, they are not married and do not have a child together.
In Miami, the appellant began sending the reporter flowers and leaving voice mail messages for her. The flowers were accompanied by a card which the appellant had signed as her husband.
The appellant attempted to see the reporter at the television station, but was denied entry by the security staff. The voice mail messages were left one to three times daily for over two and one-half months.
The tone of the voice mail messages changed. The appellant left messages indicating that the reporter would be punished and that he was preparing a cage and collar for her. He also left a message stating that the husband's body belongs to the wife and the wife's body belongs to the husband.
At this point, the reporter became concerned for her safety and contacted the police. At the advice of the police, the reporter arranged a meeting with the appellant. When the appellant appeared for the meeting, he was arrested.[4]
Despite the reporter's testimony at the hearing that she did not know the appellant and had no relationship with him, the appellant testified that he had been responsible for the reporter's obtaining her job in Miami. He claimed that the reporter in fact has an ongoing relationship with him, but is afraid to reveal it because the police and a gay women's association are threatening her.
Several psychiatrists testified at the hearing. With one exception, they agreed that the appellant posed a physical threat to the reporter within the meaning of the statute.
Dr. Leonard Haber testified that the appellant is suffering from "paranoid disorder... and centers around paraphilia, sexual obsession." "[G]iven the nature of the disorder and his [appellant's] complete lack of awareness that he was operating on fantasies and not reality, ... this type of *536 disorder, does have a potential of escalating into [violent] actions." Based on appellant's "determination to pursue his line of reasoning and beliefs, and upon the history of the matters of this type, they tend to either increase in severity and escalate, or to reattach to other persons, and are not likely to go away if left unattended."
Dr. Sonia Ruiz testified that the appellant suffers from "delusional disorder, [erotomanic]." She concluded that he posed a threat of substantial bodily harm to himself or others if not treated. "When the love is not returned, that love very easily turns to hate or rage.... Most men rather than females with delusional disorders tend to act out on their irrational beliefs."
Dr. Rafael Conte, the treating physician, opined that the appellant would be properly classified as either having a delusional disorder, [erotomanic] type, or schizophrenia, paranoid type. The doctor found the appellant to be extremely paranoid. He would talk to himself for long periods of time, but deny having such conversations. The appellant does not believe that he has a mental illness or that he needs treatment. Upon the doctor's "asking a question or ... probing to get to a concrete answer, [appellant] becomes physically or verbally aggressive.... I don't want to push him too much, because I am concerned that it could escalate if you push his buttons."
The doctor continued:
He has gotten himself in a situation because of his delusions, and we're here because of the way he has been behaving, and he is easily agitated. I also believe that these delusions can lead to violence when they have these psychotic fixed delusions on a victim, and it is true that if the alleged victim disappeared, that he could possibly and probably do the same thing to someone else.
. . . .
He has been acting on delusional material, and following this woman from California to here, and he has gotten himself into a situation that we're here now because of his delusional ideas pertaining to this woman, and from what I understand because of his behavior and his aggressive behavior and lack of insight, and the threatening nature of when he is confronted with this material and the threatening nature when he is told to take medication, and he doesn't agree, that leads me to believe if this woman doesn't respond to what he thinks he needs, he will probably become threatening to her too.
The exception to the foregoing was the testimony from Dr. Lyle Kunz, appellant's expert, who had interviewed appellant for approximately thirty minutes. Dr. Kunz concurred that the appellant suffers from a mental disorder, but did not have a specific diagnosis. Dr. Kunz' initial opinion was that the appellant did not pose a substantial risk of harm to himself or others, but he had not been informed of the statement regarding cage and collar. He acknowledged that the comment would have to be taken into consideration in evaluating appellant. Dr. Kunz' main recommendation was that appellant be thoroughly evaluated from a mental health standpoint.[5]
We have no hesitation in concluding that the appellant met the standards for civil commitment. The evidence showed that the appellant is a person who was acting on his delusions, first in following the reporter to Miami, and then in attempting to *537 contact her by telephone and in person. The nature of his telephone messages had already changed to the subject of punishment, including the "cage and collar" comment. The nature of the mental disorder was one in which appellant would continue to pursue the object of his deluded affections, and violence was likely at such point as appellant actually made contact with the reporter and she refused his attention.[6]
We therefore affirm the commitment order.

IV.
We would like to suggest that the legislature revisit the Baker Act.
It likely will come as a surprise to legislators, as it does to us, that the civil commitment system is unable to act in cases of stalking or harassment of a citizen unless there is a threat of serious physical injury.
Certainly the Baker Act must strike a balance between the rights of the mentally ill and the rights of citizens. But it would seem that if a mentally ill person is acting on his or her delusions to the point of stalking or repeatedly harassing law-abiding citizens, then civil commitment should be an available option where no other remedy will do.
Stated differently, the present Baker Act allows a mentally ill person to inflict less-than-serious bodily harm on others, and an unlimited amount of emotional injury, without being a candidate for civil commitment. The civil commitment system is authorized to intervene under the present statute only if there is a threat, or the reality, of serious bodily harm. We suggest that consideration be given to readjusting the balance.

V.
For the stated reasons, the commitment order is affirmed.[7]
NOTES
[1] The transcript indicates that a guardian had not been appointed for the appellant at the time of the commitment proceedings.

Although not an issue here, it is not clear to us how the decision was made to oppose the commitment proceedings, when the appellant was by all accounts mentally ill, unable to appreciate the fact that he was mentally ill, and unable to make an informed decision whether to consent to treatment.
[2] Another statutory alternative, not involved here, provides:

2.a. He or she is manifestly incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and without treatment, is likely to suffer from neglect or refuse to care for himself or herself, and such neglect or refusal poses a real and present threat of substantial harm to his or her well-being....
Id. § 394.467(1)(a)2.a.
The statute also requires that "[a]ll available less restrictive treatment alternatives which would offer an opportunity for improvement of his or her condition have been judged to be inappropriate." Id. § 394.467(1)(b). The issue of less restrictive alternatives is not involved here.
[3] In determining whether there has been a threat, the statute looks to "recent behavior" of the patient. See id. The "recent behavior" can be shown by words, deeds, or both.
[4] The reporter separately initiated civil injunction proceedings against the appellant.
[5] An additional State expert, Dr. Marilu Sabas also concluded that the appellant posed a threat of severe bodily injury. Excluding the matters referred to in footnote 7, her opinion was quite abbreviated and cumulative of those of Drs. Haber, Ruiz, and Conte.
[6] The psychiatric consensus was clear. The one exception, Dr. Kunz, must be discounted because he had not been given all of the material facts.
[7] In reaching this conclusion, we have not relied on the portion of the proceedings relating to a threat of sexual battery which the appellant was said to have made to two other patients during his stay in the mental health unit. It is unnecessary for present purposes to reach appellant's argument that this part of the State's case rested on inadmissible hearsay.